UNITED FOOD & COMMERCIAL
WORKERS UNION, LOCAL
17A, Plaintiff,

v.

SUPERIOR'S BRAND MEATS,
INC., Defendant.

No. C86–5271A.

United States District Court,
N.D. Ohio, E.D.

Jan. 13, 1987.

William B. Gore, Laybourne, Smith, Gore & Goldsmith, Akron, Ohio, for plaintiff.

Samuel Krugliak, John Bogniard, Krugliak, Wilkins, Griffiths & Dougherty, Canton, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

On December 23, 1986, plaintiff United Food & Commercial Workers Union Local No. 17A ("the union") filed a complaint and motion for preliminary injunction, invoking jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The union asks the Court to enjoin its defendant employer, Superior's Brand Meats, Inc. ("Superior") from further layoff of employees at Superior's Massillon, Ohio plant, and for reinstatement with back pay of all employees already laid off, pending the outcome of arbitration on a grievance which the union filed on December 17, 1986. For the reasons that follow, the Court denies the plaintiff's motion for preliminary injunction.

### II. FACTUAL BACKGROUND

A. *Employer-Union Relationship.*

The plaintiff union is the exclusive collective bargaining agent for all production and maintenance employees of the defendant Superior. Superior buys and slaughters cattle and hogs. It then processes the meat (mostly pork) and sells it to various customers. To accomplish this process, Superior has several departments, two of

which are known as "hog kill" and "pork cut."

Plaintiff and defendant are parties to a collective bargaining agreement in effect from October 1, 1985 through September 30, 1988. Like most collective bargaining agreements, the one at issue provides terms as to wages, hours, and other working conditions. It also provides for disputes to be resolved through a grievance procedure culminating in final and binding arbitration.

Paragraph eleven of the agreement confers certain management rights exclusively upon the company. Among these are the right to "lay off employees because of lack of work ... provided that in the exercise of these rights the Employer's acts do not conflict with any other condition of this Agreement."

Paragraph 46 of the agreement provides that Superior "shall give each employee two (2) days notice of lay-off." Paragraph 62, on the other hand, governs the notice to be given in the case of the total elimination of any certain department. Paragraph 62 states:

> The Employer will make every reasonable effort to give two (2) months' notice to the Union of elimination of any department or the installation of any machinery which will displace employees.

Paragraph thirteen governs the seniority rights of employees. It recognizes two types of seniority: plant-wide seniority and departmental seniority. In an ordinary lay-off situation, employees are laid off according to plant-wide seniority. Paragraph 15(a) of the collective bargaining agreement states:

> In the event of a reduction of the workforce within a particular department, the employees having the least seniority within that department will be required to exercise their plant-wide seniority in order to avoid a lay-off but shall not have the right to select the jobs to which they are transferred.

By contrast, the elimination of an entire department is known as a "paragraph 62 lay-off." Unlike an ordinary lay-off, a paragraph 62 lay-off triggers what are called "paragraph 14 bumping rights." Paragraph 14(e) states in part:

> In the event of a permanent or permanent partial department closedown, such displaced employee shall have the right to selection of two (2) departments and a thirty (30) day working trial period in each department.

Paragraph 14(e) continues on to place certain limitations upon a displaced employee's right to selection, but it nonetheless provides him more of a choice than he would have in an ordinary lay-off situation. Thus while seniority plays a role in any lay-off situation at Superior, employees whose department is permanently closed down have somewhat of an advantage over employees who are victims of an ordinary (i.e. temporary) lay-off. *See* Tr. 236–238.

B. *The History of Superior's Brand Meats, Inc.*

Superior's Brand Meats, Inc. has been in existence for over fifty years. It started out with one plant, the plant in Massillon, Ohio which is the same plant now involved in this lawsuit. Over the years Superior acquired three more plants: Worthington in Indiana, Sugardale in Canton, Ohio, and Carriage Hill in Salem, Ohio. Superior has the capacity to engage in hog kill and pork cut operations in its Massillon, Canton, and Worthington plants. In fact, the Worthington plant is limited exclusively to hog kill and pork cut operations. Worthington can process 3600 hogs per day. The Massillon plant and the Sugardale plant in Canton can each process 3000 hogs per day. The Carriage Hill plant in Salem does not have hog kill or pork cut departments. It is a non-union plant which is presently the target of a union organizing effort. The company has a "no lay-off policy" with regard to the non-union Carriage Hill plant.

C. *Events Leading to the Present Lawsuit.*

According to the testimony of Gary Feiock, president and business agent of UFCW Local 17A, in July of 1986 Superior closed down its Worthington plant (the plant devoted exclusively to hog kill and

pork cut). This left only two hog kill/pork cut operations running (i.e. those in Massillon and Canton). At about this time, Mr. Feiock said, company officials suggested to the union that the company needed only two, not three, hog lines and that one of the three hog lines would eventually have to be closed. According to Mr. Feiock, a company official stated that the "Superior [i.e. Massillon] kill was the odd plant out so to speak, the odd kill out, meaning that's the one that because they only need two, that's the one that was going to go." Tr. 24–25.

The Worthington plant's union subsequently negotiated a new contract with concessions of $2.50 to $3.00 per hour. Shortly after the signing of the new contract, the Worthington plant was reopened on or about November 17, 1986. Tr. 191–196.

Approximately three weeks later, on December 5, 1986, Superior closed down the hog kill/pork cut departments at its Massillon, Ohio plant. Tr. 20–21. The company then began the removal of significant amounts of equipment needed to run the hog lines.

At the preliminary injunction hearing on December 31, 1986, much of the testimony was devoted to the extensiveness of the hog line equipment removal. *See* Tr. 107–124; 25–27. The union's testimony revealed that the company has been removing not only smaller easily transportable equipment, but also equipment so massive and difficult to move that it might be reasonable to infer that the company has decided to close permanently the hog kill/pork cut departments at Massillon. On the other hand, the union did not dispute that all the removed equipment could be reinstalled within a week. Tr. 127–129. Further, company witnesses testified that in temporary shut-down situations, it is not unusual to transfer equipment back and forth from one plant to another. Tr. 164–167. Nevertheless, union witness Robert Burkhart testified that, in his 24 years at

Superior, a dismantling of such magnitude had never before occurred in a normal lay-off situation. Tr. 124.

The equipment removal, coupled with the company's suggestion months earlier that Superior only needed two hog lines instead of three, led the union to reach the following conclusion: that Superior had decided to eliminate permanently the hog kill/pork cut departments at the Massillon plant.

Based upon the fear of permanent shut down, union witness Gary Feiock testified that on December 15, 1986 a meeting was held between company and union officials. According to Mr. Feiock, Superior's executive vice president Joseph Sebring made remarks to the effect that:

.... the smoked meats and beef kill departments at Massillon were "next in line to be done away with." Tr. 30.[1]

.... by mid-January the company was "seriously considering" moving the sausage/sliced luncheon operation to Sugardale. Tr. 33.[2]

.... the "worst scenario" would be that the Massillon plant would become a corporate office distribution center facility. Tr. 33–34.

.... on the other hand, "if things turned around" the company would start the plant back up. Tr. 33.

Mr. Feiock further testified that the week of the lay-off was actually the busiest season for pork. After the Massillon hog lines were shut down, in order to keep up with its customer demand, Superior increased production at Sugardale to the extent of paying for overtime work, and it also was forced to purchase loins of pork from other meat packers. Tr. 83.

Thus summarizes the testimony concerning the circumstances which led the union to reach the conclusion of permanent elimination. Based upon this conclusion, and upon the fact that the company had not given the union two months' notice, on December 17, 1986 the union filed a griev-

---

1. Mr. Feiock stated that about 120 employees work in the smoked meats and beef kill departments. Tr. 31.

2. Mr. Feiock stated that the sausage/luncheon meat departments involved "practically the remainder of the employees in the plant." Tr. 33.

ance on the theory that the company had violated paragraph 62 of the collective bargaining agreement which states:

The Employer will make every reasonable effort to give two (2) months' notice to the Union of elimination of any department or the installation of any machinery which will displace employees.

The union requested the following settlement of the grievance:

Return employees to shut down departments & make all affected employees whole as a result of the violation. Grievance form filed 12–17–86 (Exhibit B to Complaint).

On December 22, 1986, the company denied the grievance. At a meeting held the same day between the company and the union, union witness Gary Feiock testified that the union demanded what is known as "expedited arbitration," apparently a term of art under this particular collective bargaining agreement whereby parties employ a local arbitrator instead of going through the American Arbitration Association (the AAA). The company refused the union's request for expedited arbitration, insisting instead on an arbitrator from the AAA. However, the company has since requested the AAA to expedite the grievance in this matter. *See* Affidavit of Raymond E. Griffiths attached to defendant's hearing brief filed January 9, 1987.

On December 23, 1986, the union filed the present action and asked that, pending the outcome of arbitration, the company be restrained from the following:

a) Continuing to violate the aforesaid provision of the Agreement of the parties hereto, more specifically Paragraph 62.

b) The further layoff of employees at its plant at Massillon, Ohio, until a prior two (2) month notice is given to the Union in accordance with Paragraph 62 of the Agreement between the parties.

c) Refusing to reinstate, with back pay, all employees in both the pork cut and pork kill departments who have been laid off since December 4, 1986, and thereafter.

d) Refusing to expedite arbitration on the grievance, Exhibit "B".

e) Such other and further relief as the Court may deem to be just and proper including, but not limited to, attorney fees and court costs.

The company denies that it has decided to close permanently the hog lines at Massillon. It has admitted considering additional lay-offs, however, and has not vigorously denied the union's suggestion that the Massillon plant would eventually end up as nothing more than a distribution center and corporate headquarters.

## III. LEGAL POSITIONS

### A. *The Union's Position.*

As noted earlier, the union has concluded from all the surrounding circumstances that the company has decided to eliminate permanently the hog kill/pork cut departments at its Massillon plant. Because the company did not give the union two months' notice of the alleged elimination, the union claims that the company has violated paragraph 62 of the collective bargaining agreement.

The union takes the position that paragraph 62's two-month notice provision implies that the company must guarantee employees two-months' pay before closing down the employees' department permanently. The union claims that the purpose of the notice provision is to assist the laid off personnel, in a case where their jobs have been permanently eliminated, to readjust their lives and to be able to cope with the fact that their jobs are completely gone. At the preliminary injunction hearing, the union's international representative James Fuchs testified about the devastating physical and mental health effects of unemployment on workers. *See* Tr. 132–139 and plaintiff's Exhibit 4 entitled *UFCW Economic Dislocation Manual.* The union further claims that the notice provision was intended to permit the parties to discuss various alternatives to total elimination.

The union asserts that it needs court intervention in this labor dispute because it will suffer irreparable harm otherwise. Stating that the stress related to job loss is

so great that permanent unemployment without notice causes irreparable harm, the union has summarized its position as follows:

> With the proper notice, employees would have the opportunity to work with community based organizations in order to assist them in adjusting to the loss of their jobs. Without the proper notice of the impending loss of employment, the employees are harmed immediately and permanently. Since an arbitrator's award of back pay cannot remedy what the lack of notice caused, the Company's employees will be irreparably harmed. Accordingly, in this case, a preliminary injunction is warranted. Plaintiff's Final Brief in Support of its Motion for Preliminary Injunction at pp. 9–10.

Mr. Fuchs testified that in his opinion an award of back pay cannot remedy the lack of notice because it would be similar to an attempt to breathe life back into someone who had committed suicide. Tr. 138–39.

The Court observes several difficulties with the union's position. The first is that the collective bargaining agreement recognizes plant-wide seniority. Due to this plant-wide seniority, the employees who in the long run actually lose their jobs in the event of a department shut down are not necessarily the employees in the affected department. Thus the notice provision does not necessarily assist laid off personnel to readjust to the emotional fact that their jobs have been lost.

Secondly, paragraph 62 contains no language which guarantees two-months' pay between the time the union is notified of department elimination and the time when the employees are laid off. Nor does paragraph 62 explicitly provide that the company is not permitted to lay off the employees in the interim.

Third, it is difficult to second guess the employer's motivation for the Massillon lay-offs. The union does not contest the company's assertion that the meat business is one which requires great flexibility due to market conditions. The company has stated that market conditions in future may cause it to reopen the Massillon plant.

Also with regard to the company's motivation, the union has presented evidence to suggest that the Massillon lay-offs are prompted by the company's desire to wring concessions from the union. On the other hand, company testimony claimed that the cost in purchasing the hogs accounts for approximately 75% to 80% of Superior's costs, and that labor accounts for only about 7% of costs. Tr. 245.

From the evidence on both sides, it might be reasonable to conclude that the Massillon lay-offs were motivated by the company's animosity toward the union. However, it might also be reasonable to conclude that market conditions forced the company to close down one of its three hog lines; that the company had to choose which one of the three it would close; and that the less expensive cost of labor at Worthington was the factor tipping the scales in favor of a decision to reopen Worthington and close down Massillon. Thus, even if company motivation were a relevant factor in the Court's decision today, the evidence does not clearly indicate one way or another just what the motivation was.

### B. The Company's Position.

The Company's first position is that it has not decided to close permanently the hog kill/pork cut departments in its Massillon plant. Thus, the company asserts, it was not required to give two-months' notice pursuant to paragraph 62 of the collective bargaining agreement. Further, the company denies that paragraph 62 guarantees two-months' pay to employees following a notice of elimination. Rather, the company claims, the purpose of paragraph 62 is merely to create certain preferential "bumping rights" for employees in a department which is permanently eliminated. As noted earlier, a paragraph 62 elimination triggers paragraph 14(e) of the collective bargaining agreement. Paragraph 14(e) gives the employee some option as to which department he would like to work in when his home department has been eliminated. As the company has stated its position:

*This limited job selection right is the only remedy available to the Union under Paragraph 62.* This is the remedy available to employees if an arbitrator finds in favor of the Union. Defendant's Hearing Brief at p. 15 (emphasis in original).

## IV. THE LAW APPLICABLE TO FEDERAL COURT INJUNCTIONS IN LABOR DISPUTES

On two earlier occasions, this Court has had the responsibility to apply the law applicable to the Court's power to issue an injunction in a labor dispute. *See International Union, United Automobile, Aerospace & Agricultural Implement Workers of America—UAW, et al. v. Goodyear Aerospace Corp.,* —— F.Supp. ——, Case No. C86–4873A (N.D.Ohio 1986); *Amalgated Local 813, International Union, Allied Industrial Workers of America v. Diebold, Inc.,* 605 F.Supp. 32 (N.D.Ohio 1984). A review of that applicable law is in order here.

■ The Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq,* is the primary authority guiding the Court in the present case. The Act contains broad prohibitions against the issuance of injunctions in labor disputes. There are some narrow exceptions to the rule, however. For example, if a collective bargaining agreement contains both a binding arbitration clause and a no-strike clause, and if a subsequent strike involves an arbitrable grievance, an employer can obtain an injunction against the strike. *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970). If the strike results from an underlying dispute which is not arbitrable, however, no injunction can issue against the strike. *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 407–08, 96 S.Ct. 3141, 3147–48, 49 L.Ed.2d 1022 (1976).

In a so-called "reverse *Boys Market*" situation, the same principles apply to injunctions against employer breaches of a labor agreement. *Machinists Local Lodge 1266 v. Panoramic Corp.,* 668 F.2d 276, 280 (7th Cir.1981). It is this "reverse *Boys Market*" situation that is before the Court in the present case.

In *Aluminum Workers International Union v. Consolidated Aluminum Corporation,* 696 F.2d 437 (6th Cir.1982), the Court set forth the guidelines which this Court must follow in deciding whether to issue the requested injunction in this case.

■ First, the union must establish that the underlying grievance is one which is arbitrable. Secondly, in addition to establishing arbitrability, the union must prove its entitlement to an injunction under ordinary equity principles. As the *Aluminum Workers* court summarized it:

Specifically, the union must demonstrate that breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer more from the denial of the injunction than the company will from its issuance. 696 F.2d at 442 (quoting *Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. at 1594).

Thus, there is a strong federal policy against federal courts issuing injunctions in labor disputes. Equally strong is the federal policy in favor of arbitration of labor disputes. In the landmark case of *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960), the Supreme Court of the United States stated as follows:

The present federal policy is to promote industrial stabilization through the collective bargaining agreement. A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.

In recognition of the statutory scheme established by Congress, Federal Courts must be reluctant to intrude upon the domain of the arbitrator.

■ To summarize, before enjoining conduct in a labor dispute, a federal court must first conclude that the underlying dispute in a given case is one which is arbitra-

ble. In the present case, the parties concede that the underlying dispute is arbitrable and in fact are in the process of arbitration. Having determined arbitrability, the Court must now turn its attention to the principles of ordinary equity which must be present in order for the Court to enjoin conduct in a labor dispute.

The Court finds that the union has demonstrated that a breach of the collective bargaining agreement has arguably occurred. The union presented evidence which could reasonably lead to the conclusion that the company has decided to eliminate the hog kill/pork cut departments in Massillon. Arguably such an elimination, without two-months' notice, is conduct which violates paragraph 62 of the collective bargaining agreement.

The Court must next consider whether the union has demonstrated that it will suffer irreparable harm as a result of the alleged breach. On this issue, the company relies heavily on the *Aluminum Workers* case, where the Sixth Circuit held as follows:

> The Union argues that loss of employment constitutes irreparable harm because awards of back pay and reinstatement, traditional remedies for such an injury, cannot fully compensate employees for the repossessions, foreclosures, and injury to credit stature which could accompany unemployment. We disagree insofar as loss of employment is, as it is here, solely the result of job eliminations by a solvent employer. Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment, we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the union for injunctive relief. 696 F.2d at 443.

In this Court's view, the facts of the present case are distinguishable from those before the Court in *Aluminum Workers*. The union here claims that paragraph 62 was meant to give displaced employees a sense of finality. In other words, the union asserts that its members are presently in a state of limbo, so to speak, and that this condition constitutes irreparable harm for which no arbitrator can fashion an adequate remedy. It is this desire for a sense of finality which the Court concludes takes this case outside the facts of those in *Aluminum Workers*. The Court is inclined to agree with the union's position on the question of irreparable harm. And yet the Court cannot reach that question nor the next, that of the balance of hardships.

For purposes of explanation, the Court assumes that the union has prevailed upon all the factors enunciated by the *Aluminum Workers* court, i.e., arbitrability, breach, irreparable harm, and balance of hardships. Despite this assumption, the union seeks a remedy which the Court has no power to grant.

The union requests the Court to reinstate the employees laid off in the hog kill and pork cut departments, or to require payment for two months. This relief is tantamount to issuing the very same award that an arbitrator would issue if an arbitrator adopted the union's position as correct. If the Court were to grant the union's requested relief in this case, the Court would in effect be issuing *the* remedy for a violation of the collective bargaining agreement. To do so would usurp the function of the arbitrator and would therefore be violative of the Norris-LaGuardia Act and subsequent controlling judicial pronouncements.

Perhaps the situation would be different if the collective bargaining agreement were so clear and unambiguous as to be susceptible of only one interpretation: the union's. That is not the case here, however, primarily because paragraph 62 does not explicitly provide for guaranteed pay of two months following a decision to eliminate a department. Furthermore, this Court cannot declare with certainty that the company has in fact decided to close permanently the hog kill/pork cut departments at Massillon.

Thus the collective bargaining agreement at issue here could be said to be capable of

two interpretations. So, too, the actions of the company could be said to be capable of two interpretations. Finally, if the arbitrator eventually adopts the union's position as to the meaning of the collective bargaining agreement, the award he might render is the very same relief sought by the union from this Court. In such a situation, the Court must conclude that it lacks the authority to issue the requested relief.[3]

## V. CONCLUSION

In reaching its decision today, the Court has struggled with issues it finds both unique and extremely important. The issues have been well presented by able counsel from both sides of the dispute. The Court realizes the devastating impact of the massive lay-offs upon the employees, their families, and the community of Massillon. Nonetheless, for the reasons stated above, the Court concludes that it lacks the authority to grant the injunctive relief sought by plaintiff's motion for a preliminary injunction. Plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.

---

3. During the evidentiary hearing conducted on December 31, 1986, the focus of the union's attack upon the company action appeared directed at the request for reinstatement of the employees affected by the shutdown of the "hog kill" and "pork cut" lines. In its post-hearing brief, the union now appears to emphasize its request for relief from additional lay-offs. This request seems to be anchored in the claim that additional lay-offs in other departments are part of a systematic shut-down of the Massillon plant. Injunctive relief in the reverse *Boys Market* context, when granted, is for the purpose of maintaining the *status quo* until the arbitrator renders a decision on the arbitral dispute. The union appears to suggest that enjoining further lay-offs would constitute a maintaining of the *status quo*. The Court disagrees. Enjoining of further lay-offs would not maintain the "*status quo*," but would constitute the remedy the union seeks in connection with its interpretation of paragraph 62. In addition, before enjoining further lay-offs, the Court would first have to make a factual determination that the lay-offs were the result of more eliminations of other departments such as sausage and sliced luncheon. The Court cannot make such a determination when the evidentiary hearing was not focused upon departments other than hog kill and pork cut.