**ALUMINUM WORKERS INTERNATIONAL UNION, AFL–CIO, LOCAL UNION NO. 215, Plaintiff-Appellee,**

v.

**CONSOLIDATED ALUMINUM CORPORATION, Defendant-Appellant.**

No. 82–5227.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 27, 1982.

Decided Dec. 22, 1982.

Rehearing and Rehearing En Banc Denied March 7, 1983.

---

**8.** Compare 20 U.S.C. §§ 1681–82 (Title IX) with 42 U.S.C. §§ 2000d–2000d–1. (Title VI).

438

Michael J. Bobroff (lead counsel), Mark G. Arnold, Patrick C. McKenna, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for defendant-appellant.

Tim Edwards, Gerber, Gerber & Agee, Memphis, Tenn., for plaintiff-appellee.

Before KENNEDY, MARTIN, and KRUPANSKY, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Consolidated Aluminum Corporation appeals an order enjoining it from reorganizing job classifications pending arbitration. The district court found that the reorganization, which would eliminate sixteen jobs, would irreparably harm those left unemployed and that any subsequent award by an arbitrator would be inadequate to recompense the employees for their injuries. We stayed that portion of the order enjoining reclassification pending this appeal. We now vacate the injunction, the injunction bond, and the order to arbitrate and remand to the lower court for rehearing to determine Consolidated's damages.

Consolidated and Aluminum Workers International Union, AFL–CIO, Local 215 are parties to a collective bargaining agreement effective until July 18, 1984. Article 5 of the agreement is a broad grievance and arbitration provision which includes the following language: "Should any difference arise between the company and any employee, under and during the terms of this agreement, an attempt in good faith shall immediately be made to amicably adjust such matters in an orderly fashion and in the following manner." There follows a four-step dispute resolution procedure culminating, in step four, with arbitration.

On March 23, 1982, Consolidated notified the Union that it intended to restructure certain job classifications referred to in the agreement by reassigning duties from one job classification to another with the ultimate effect of eliminating sixteen employees. Consolidated maintained that article 3 of the agreement specifically authorized such unilateral action by management. Article 3 provides, in part: "Subject to the provisions of this Agreement, the manage-

ment of the plant and the direction of the working forces are vested exclusively in the company (does not take precedence over the provisions of the labor agreement)."

In response, the Union asserted that article 3 was subject to article 10(D) which prohibits job reclassifications unless necessitated by plant expansion. Article 10(D) provides, in part:

It is recognized by the parties that the Company's operation shall be divided into the departments as outlined in Appendix B of this agreement with the job classifications and wage grades included within and comprising each such department.

As the Company's operations expand it may, from time to time, establish such further departments and job classifications as may be necessary. Before new departments or classifications or changes in existing classifications are established, the Company shall meet with the Union and explain the changes and reasons therefor. The Company shall give a written explanation of the changes and reasons to the Union. The Company and the Union shall mutually agree to the rates to be paid for each classification and the seniority of the employee effected.

If no mutual agreement is made, the Union may file a grievance and arbitrate the matter.

That this was not the first time the parties disagreed over interpretation of 10(D) is clear from the inclusion in the agreement of article 34—"Letters of Understanding." That article provides, in part:

"During the course of 1981 contract negotiations, Art. ... 10(D) ... [was] ... discussed and no agreement reached except to return to current contract language. The agreement reached above recognizes that the parties do not agree upon interpretation of the 1978–81 contract language and that this memo simply recognizes and confirms each party's agreement to disagree and does not prejudice either party's position."

Consolidated was not persuaded. On April 4, it implemented its plan. On the following day, the Union filed its complaint.

On April 6, after hearing, the court ordered Consolidated to reinstate the sixteen laid-off employees and to return to the *status quo ante* pending arbitration. The court found that "the changes effected by ... [Consolidated] ... appear to be in violation of [a]rticle 10(D)" and that the "apparent breach" had occurred and would continue unless enjoined. It also found that:

[Consolidated] ... will suffer little or none from issuance of an injunction pending arbitration requiring it to continue the operations as it has in the past. While such an order will reinstate laid-off employees, ... [Consolidated] ... will have the benefit of production from those persons. On the other hand, denial of the injunction will irreparably harm employees represented by ... [the Union] ... in that job opportunities and wages will be lost. An arbitration award will not substantially return these persons to status quo ante.

The injunction bond was set at $1,000 and the parties were ordered to proceed to arbitration. The court specifically stated, however, that nothing in its order precluded Consolidated from reducing the size of its work force pursuant to article 12(A) of the agreement. Article 12(A) provides, in part: "the Company shall have the right to reduce the force of employees at any time."

Consolidated immediately filed a notice of appeal and a motion in the district court to stay the injunction pending appeal. That motion was denied. An identical motion filed in this court was granted.

Here, Consolidated raises several issues. First, it contends that its actions did not threaten the integrity of the arbitration process. Therefore, it continues, the lower court lacked jurisdiction to issue an injunction. Second, even if the court had jurisdiction, it exercised it improperly because it failed to make the requisite findings of fact necessary to both support the issuance of an injunction in these circumstances and to properly set the amount of the bond. Finally, it contests the scope of the injunction insofar as it orders the parties to arbitrate.

There is no more fundamental policy in our national labor laws than that which favors peaceful resolution of labor disputes through voluntary arbitration. *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Steelworkers* trilogy (*United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Nolde Brothers, Inc. v. Local 358, Bakery and Confectionary Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1973), promotes that policy by severely limiting the jurisdiction of the federal courts to intercede in labor disputes. Section 4 provides, in part:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

Despite the broad prohibitions of section 4, the Supreme Court has recognized a "narrow exception" to the anti-injunction policy of the Act. In *The Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Court rec-onciled the narrow strictures of section 4 with the more permissive language of section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a) (1973). It held that the inability of an employer to obtain judicial enforcement of a no-strike clause in a collective bargaining agreement could do more to undermine faith in the arbitral process than a strictly enforced anti-injunction policy would promote it. It reasoned that the employee's promise not to strike is the *quid pro quo* for the employer's promise to arbitrate. Absent some mechanism for enforcement of the no-strike obligation, however, the employer has little incentive to commit to arbitration. To remedy the situation, the Court enunciated "a narrow exception" to the rigid prohibitions of section 4. It held that when the underlying dispute is one over which the parties have agreed to arbitrate and traditional equitable bases for relief have been met, a court may enjoin a strike in violation of a no-strike clause.[1]

Although *Boys Markets* involved employee violation of a no-strike clause, unilateral action by employers may have an equally pernicious effect on the arbitral process. Therefore, the courts have extended the *Boys Markets* exception to embrace employer behavior which has the effect of evading a duty to arbitrate or which would otherwise undermine the integrity of the arbitral process. *See LaSalle Machine Tool, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW and UAW Local 155,* 696 F.2d 452 (6th Cir.1982); *Hoh v. Pepsico,* 491 F.2d 556 (2d Cir.1974); *United*

---

1. The Court's precise language was:

A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract *does* have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. Beyond this, the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

*Id.* at 254, 90 S.Ct. at 1594 (emphasis in original).

*Steelworkers v. Fort Pitt Steel Casting,* 598 F.2d 1273 (3d Cir.1979); *Lever Brothers Co. v. International Chemical Workers Union, Local 217,* 554 F.2d 115 (4th Cir.1976); *Local Lodge No. 1266 v. Panoramic Corporation,* 668 F.2d 276 (7th Cir.1981); *Amalgamated Union, Division 1388 v. Greyhound Lines, Inc.,* 529 F.2d 1073 (9th Cir.), *vacated and remanded on other grounds,* 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976), *reversed,* 550 F.2d 1237, *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). To obtain an injunction, however, the union, like the employer, must establish that all of the *Boys Markets* criteria have been met. *See Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18,* 471 F.2d 872, 876 (6th Cir.1972). We turn now to the facts of this case.

### I.

#### A. Arbitrability

In *Boys Markets,* the Court expressly conditioned the availability of injunctive relief upon a finding that the underlying grievance is one which the parties are contractually bound to arbitrate. *Id.* at 254, 90 S.Ct. at 1594; *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976). The Union has no difficulty establishing arbitrability here. Consolidated concedes that fact and, we note, both parties are actively pursuing arbitration.

**2.** An equally well-established equitable principle not mentioned by the Supreme Court but applied by other courts in *Boys Markets* situations is the requirement that a party seeking equitable relief demonstrate a likelihood of prevailing upon the merits. There seems to be good reason for the Court's silence. If applied literally in the labor injunction context, it requires the reviewing court to do precisely what the policies embodied in our national labor laws and the strict language of *Buffalo Forge,* 428 U.S. at 411–412, 96 S.Ct. at 3149–3150, command it not to do—encroach upon the arbitrator's domain by predetermining the merits of the dispute. *Panoramic,* 668 F.2d at 284. We, therefore, decline to apply that requirement literally. Instead, we adopt a standard first enunciated by the Ninth Circuit in *Greyhound:*

#### B. Equitable bases for relief

■ In addition to establishing the arbitrability of the dispute, the union must satisfy the court that injunctive relief is warranted under "ordinary principles of equity." Specifically, the union must demonstrate that breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer more from denial of the injunction than the company will from its issuance. *Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594.[2]

#### 1. Ongoing nature of the breach

The Union encounters no difficulty in establishing the ongoing nature of Consolidated's alleged breach of the agreement. Reclassification and the attendant loss of jobs had occurred prior to the issuance of the *status quo* injunction. If it has not already been reimplemented following our stay of that injunction, it is clear Consolidated intends to do so if permitted.

#### 2. Irreparable harm

Although the Union may easily meet other *Boys Markets* criteria, it has considerable and, ultimately, insurmountable difficulty demonstrating that it will suffer irreparable harm if Consolidated's reclassification plan is not enjoined. It is for this reason, therefore, that the Union's request for injunctive relief should have been denied.

> [A] plaintiff, without regard to whether he is the employer or the union, seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Markets* ... need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. If there is a genuine dispute with respect to an arbitrable issue, the barrier [to the issuance of an injunction] we believe appropriate[ly sic] has been cleared. 529 F.2d at 1077–1078. *Accord, Panoramic,* 669 F.2d at 284–285; *Lever Brothers,* 54 F.2d at 120. It is clear that the Union has met this threshold here.

Irreparable harm is injury so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party. It renders the award an "empty victory," *Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad,* 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1435 (1960), *quoted in Panoramic,* 668 F.2d at 286, and thereby undermines the integrity of the arbitral process as thoroughly as did the union's violation of the no-strike clause in *Boys Markets.*

Because it is this very "frustration or vitiation of arbitration," *Panoramic,* 668 F.2d at 286, which justified the "narrow exception" to the anti-injunction provision of the Norris-LaGuardia Act, the irreparability of the injury suffered by the union has in many cases become virtually the sole inquiry in those cases where injunctive relief is sought against an employer. *See Drivers, Chauffeurs, Warehousemen and Helpers, Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.,* 582 F.2d 1336 (4th Cir.1978); *Lever Brothers; Detroit Newspapers; Greyhound; Panoramic.*

The injury complained of here is loss of employment for sixteen persons. The Union argues that loss of employment constitutes irreparable harm because awards of backpay and reinstatement, traditional remedies for such an injury, cannot fully compensate employees for the repossessions, foreclosures, and injury to credit stature which could accompany unemployment. We disagree insofar as loss of employment is, as it is here, solely the result of job eliminations by a solvent employer. Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment, we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the union for injunctive relief.

The Union refers us to two relatively recent Fourth Circuit cases, *Lever Brothers* and *Akers Motor Lines,* which purportedly support its position. We disagree. On the contrary, the rationale of those decisions supports our holding here.

In *Lever Brothers,* the employer advised the union that it was permanently closing its manufacturing plant in one state and transferring production to a facility in another state. The parties disagreed as to the proper characterization to be given such action and, therefore, whether the collective bargaining contract forbade the transfer. Finding that the dispute was one properly subject to arbitration and that the union had demonstrated a likelihood of prevailing upon the merits, the district court enjoined the transfer pending arbitration.

The appellate court, without addressing the issue of irreparable harm, but adopting the reasoning of *Greyhound* as it concerned the likelihood of prevailing upon the merits, affirmed the lower court. However, in an addendum to its opinion necessitated by the Ninth Circuit's reversal of *Greyhound,* the *Lever Brothers* court did reach the question of irreparable harm. It held that the district court properly issued an injunction to maintain the *status quo* because, absent such an order, the employees at the plant from which production was to be transferred *"would have been totally and permanently deprived of their employment." Id.* at 122. (emphasis in original). In contrast, said the court, the union's grievance in *Greyhound* concerned a work schedule change. In that situation, the court continued, unlike in the situation before it, "the arbitrator *could* subsequently alter pay schedules or revise the work schedules depending on whether he found for the union or the company and return the parties to substantially the *status quo ante." Lever Brothers,* 554 F.2d at 122. (emphasis in original).

The Union also relies on *Akers Motor Lines.* In that case, the Fourth Circuit considered the propriety of *Boys Markets* injunctive relief against an employer who was partially liquidating his business. The court enjoined the liquidation pending arbitration, finding that:

If Akers-Central is allowed to continue its process of liquidation and disposition

of assets, any victory by the union at the arbitration table may be meaningless. If the remaining terminals and vehicles are sold, there will be *no jobs* for re-assignment to Local 71 employees. If assets from ongoing operations are encumbered, there will be *no fund* from which to pay vacation monies. "[T]he arbitral award when rendered could not return the parties substantially to the *status quo ante*." *Id.* at 1341. (emphasis added).

We do not take issue with the decisions of the Fourth Circuit in *Lever Brothers* and *Akers.* However, the "compelling circumstances" of those two cases are not before us. Unlike the situation in those cases, there is no evidence in this record to suggest that Consolidated would be unable to comply fully with an order for backpay and reinstatement in the event the arbitrator found the company in violation of the agreement.

The Union nevertheless points to the possible "repossessions, foreclosures, and injury to credit status" which might befall the sixteen employees left jobless. While these are undeniably hardships which may be attendant upon unemployment, they do not represent the type of harm that, by its occurrence, threatens the integrity of the arbitral process.

■ First, they are speculative damages which will materialize only in select cases and only in the event the parties are unable or unwilling to commence arbitration in a timely manner. In this case, we note, Consolidated has repeatedly professed its willingness to commence arbitration at the earliest possible date. Were that not the case, the Union would be free to seek an order compelling arbitration. *See Buffalo Forge,* 428 U.S. at 405, 96 S.Ct. at 3146–3147.

Second, the availability of unemployment relief, health insurance, and, in certain situations, financial support from the union will help mitigate the financial pressures felt by the displaced employee awaiting arbitration. Moreover, in the event the employee prevails in arbitration, the arbitrator's award of backpay could, and realistically would, be used to repair any damage to credit stature or to repurchase goods repossessed in the interim.

Third, to affirm the injunction in this case where the sole injuries alleged are the consequence of temporary unemployment would be to invite virtually every employee laid-off or discharged in a manner which arguably contravened the collective bargaining contract to resort to the courts to stay the onset of joblessness. We cannot avoid the conclusion that such a situation would have as much, if not more, of a corrosive effect upon the arbitral process as Consolidated's actions allegedly will have here. In the words of the Supreme Court, the prospect of such potentially widespread judicial involvement in the area of labor relations "would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes." *Buffalo Forge,* 428 U.S. at 410–411, 96 S.Ct. at 3149. We refuse to foster such a situation.

There being no evidence in the record to suggest Consolidated's inability to render backpay or to reinstate the sixteen employees in the event of an arbitrator's decision for the Union, we hold that the Union has failed to establish that it will suffer irreparable harm as a result of Consolidated's actions. The injunction is vacated.

3. Balance of hardships

■ Because the Union's case for injunctive relief fails on the issue of irreparable harm, it is unnecessary for us to deal with the third equitable principle specifically mentioned in *Boys Markets*—the balance of hardships. In disposing of it in this manner, we do not intend to diminish its importance in appropriate cases. Only in those cases where the party seeking relief can demonstrate irreparable harm, however, need a court go on to balance that harm against the harm to be suffered by the party against whom relief is sought.

II.

■ Consolidated also argues that the court below ignored the procedural require-

ments of section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107 (1973), when it failed to make specific factual findings as to irreparable injury. We reiterate that the inability of the Union to demonstrate irreparable harm disposes of the question of the propriety of the *status quo* injunction. Because we consider procedural compliance a critical issue in *Boys Markets* cases, however, we address it here.

Section 7 states, in part, that no federal court confronted with a labor dispute has jurisdiction to award injunctive relief unless it makes "findings of fact" as to the ongoing or threatened nature of the act to be enjoined, the irreparability of the harm suffered by the complainant, the balance of hardships, and the lack of adequate legal remedy.[3] Although some courts have questioned the applicability of section 7 to suits brought pursuant to section 301, *see Associated General Contractors v. Illinois Conference of Teamsters*, 486 F.2d 972, 975 n. 8 (7th Cir.1973); *Panoramic*, 668 F.2d at 290, this court, at least since our decision in *Detroit News*, has recognized the vitality of section 7 procedural mandates in a section 301 suit. *See also LaSalle Machine Tool*, 696 F.2d 452 (6th Cir.1982); *United States Steel Corp. v. United Mine Workers*, 456 F.2d 483, 487 (3d Cir.1972). In *Detroit News*, we reversed an order granting injunctive relief against an employer because we found both a failure to make the required factual findings of irreparable injury and a lack of evidentiary support for such a finding. Even if we were indisposed to apply section 7 in suits such as this, however, its requirements are essentially met in every case where the court properly complies with the dictates of *Boys Markets.*

In this case, the court found that:

[Consolidated] . . . will suffer little or none from issuance of an injunction pending arbitration requiring it to continue the operations as it has in the past. While such an order will reinstate laid-off employees, . . . [Consolidated] . . . will have the benefit of production from those persons. On the other hand, denial of the injunction will irreparably harm employees represented by . . . [the Union] . . . in that job opportunities and wages will be lost. An arbitration award will not substantially return these persons to status quo ante.

We specifically take issue with the court's treatment of irreparable harm. While it finds that the sixteen employees will be irreparably harmed "in that job opportunities and wages will be lost," it fails to explain why loss of job opportunities and wages constitute irreparable harm. In other words, the court neglected to address the critical issue of why the injuries complained of cannot be adequately redressed by an arbitrator's award. Unless specifically addressed and resolved in favor of the complaining party, the entire premise for equitable relief in this context, carefully enunciated in *Boys Markets* and delimited in *Buffalo Forge,* is lacking.

---

**3.** Section 7 provides, in part:

No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act

excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

(b) That substantial and irreparable injury to complainant's property will follow;

(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(d) That complainant has no adequate remedy at law; and

(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

### III.

A related issue also raised by Consolidated here is the district court's treatment of the injunction bond required by section 7.[4] Section 7 provides, in part:

> No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

The Union correctly points out that the amount of an injunction bond is within the sound discretion of the district court. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir.1978) (applying Fed.R. Civ.P. 65(c)). The exercise of that discretion, however, is constrained by the statutory language which authorizes it. Section 7 clearly states that a primary concern of the district court in setting the amount of the bond should be the sufficiency of the amount to recompense the party enjoined for "any loss, expense, or damages caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order." In its remarks accompanying the setting of the bond, however, the lower court expressly stated that its "only concern" was "to be sure that the Union can comply and whatever order it has entered is not frustrated by bond requirements." Limitation of the inquiry in this manner was error. The order setting the bond at $1,000 is therefore vacated and the case remanded for rehearing on the issue of Consolidated's damages.

### IV.

Finally, Consolidated argues that the court's order should not have included a directive to arbitrate because the only evidence before the court showed that Consolidated would willingly and expeditiously proceed to arbitration. We agree. The Supreme Court's decision in *Lincoln Mills* authorizes federal courts to issue injunctions enforcing an agreement to arbitrate when one of the parties to a collective bargaining agreement containing a grievance and arbitration provision refuses to arbitrate. That is not the case here. There is no evidence of a refusal or even a reluctance to arbitrate on Consolidated's part. In fact, we note that, at the time the Union filed its complaint in district court, it had yet to file a grievance or request arbitration.

In our decision in *Detroit News*, we emphasized that resort to equity is an extraordinary step that courts must not take lightly. " 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction [sic].' " *Id.* at 876, *quoting* 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 1431 (    ). Precisely because equitable relief is an extraordinary remedy to be cautiously granted, it follows that the scope of relief should be strictly tailored to accomplish only that which the situation specifically requires and which cannot be attained through legal remedy. *See* 29 U.S.C. § 109 (1973). There was no need here to compel the parties to arbitrate. That part of the court's order, therefore, is also reversed.

---

4. Fed.R.Civ.P. 65(c) is substantially similar to section 7. It provides:

> (c) **Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.
>
> The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

In summary, we vacate the orders of the district court enjoining Consolidated from proceeding with its reclassification plan pending arbitration, compelling arbitration, and setting the injunction bond. Because we find that the *status quo* injunction was improperly issued, Consolidated is entitled to any damages, including reasonable attorney's fees, incurred in defending against it. We remand for rehearing on the issue of damages.