**TEAMSTERS LOCAL UNION 299, Plaintiff,**

v.

**U.S. TRUCK CO. HOLDINGS, INC. and U.S. Cartage of Romulus Co., Inc., Defendants.**

No. 99–75995.

United States District Court, E.D. Michigan, Southern Division.

Jan. 19, 2000.

Nunc Pro Tunc Dec. 21, 1999.

## OPINION & ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, NUNC PRO TUNC

EDMUNDS, District Judge.

This matter comes before the Court on Plaintiffs' motion for a preliminary injunction seeking to enjoin Defendants from closing its Romulus freight facility pending arbitration. On Thursday, December 16, 1999, this Court issued a temporary restraining order which temporarily prevented Defendants from closing the facility on Friday, December 17, 1999, pending a further hearing on the matter. The Court conducted a hearing on the motion for preliminary injunction on Monday, December 20, 1999. The Plaintiffs, Teamsters Local Union 299, have filed three grievances related to the facility closing which are subject to binding arbitration under the parties' collective bargaining agreement. The grievances are still pending. The Plaintiffs seek to have the status quo maintained until the arbitrable issues can be resolved.

As discussed below, the motion for preliminary injunction is GRANTED IN PART AND DENIED IN PART. The Sixth Circuit defines irreparable harm in this context as "injury so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party." *Aluminum Workers v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441 (6th Cir.1982). Consistent with this definition, the Court must be concerned with protecting the integrity of the arbitration process. For the reasons discussed herein, the Court finds that it is not necessary for the protection of the arbitration process to require the Teamsters to continue operations at the Romulus trucking facility. However, the Court finds that it is necessary for the protection of the arbitration process that they be enjoined from any further disposition or liquidation of the assets owned by U.S. Truck Co. Holdings, Inc. Similarly, to the extent that there are

Kurt C. Kobelt, Madison, WI, for Teamsters Local 299.

any assets held by U.S. Cartage of Romulus, any further disposition or liquidation of those assets is also prohibited. Furthermore, it is ordered that the arbitration process be expedited within the framework of the parties' collective bargaining agreement.

## I. Findings of Fact

### A. The Parties

Plaintiffs, Teamsters Local 299, represent the employees of Defendant U.S. Cartage of Romulus Co., Inc. ("U.S. Cartage"). U.S. Cartage is in the trucking business, and is a subsidiary of Defendant U.S. Truck Co. Holdings, Inc. ("U.S. Truck Holdings"), which was created in 1998. U.S. Truck Holdings is the successor company to U.S. Truck, Inc. U.S. Truck was owned by Agnes Maroun, a/k/a Ann Maroun. Her brother, Mannie Maroun, owns CenTra. Two subsidiaries of CenTra, Central Transport and LINC, are in the business of managing logistics. U.S. Cartage gets it work from Logistics Insights Corp. ("LINC"), and from CTII, a trucking broker.

CenTra also owns a non-union company, C.C. Midwest. C.C. Midwest operates three trucking terminals in the Detroit area located in Detroit, Warren, Ypsilanti, and one terminal in Toledo.

The uncontroverted testimony revealed that U.S. Cartage is a non-asset based company. Its assets are held by U.S. Truck Holdings, which is a solvent company whose assets exceed its liabilities by $5 million dollars. Its assets consist of bank accounts and real property holdings. The company does not own the building in which it operates, nor does it own any of its own trucking-related equipment such as tractors or trailers.

### B. The Agreements

### 1. National Master Freight Agreement

The parties have entered into a collective bargaining agreement called the National Master Freight Agreement (hereinafter "NMFA") and its Supplement. Pl.'s Motion Exb. 1. Articles 7 and 8 of the NMFA require all disputes regarding the agreement's interpretation to be subjected to a grievance procedure which culminates in binding arbitration. Article 32 of the NMFA restricts the Defendants' ability to divert work. The agreement provides that the signatory employer will not "subcontract or divert the work presently performed by, or hereafter assigned to, its employees to non-employee owner-operators or other business entities owned and/or controlled by the signatory Employer, or its parent, subsidiaries or affiliates." NMFA Art. 32, Pl's Motion Exb. 1.

### 2. Red Circle Agreement

In addition, the parties have entered into the "Red Circle Agreement" which provides employees with guaranteed employment so long as CenTra manages logistics in Detroit. The agreement provides for full employment for U.S. Cartage workers so long as LINC or any CenTra affiliate manages logistics for Chrysler in Detroit. Pl's Motion Exb. 2. The pertinent language reads, "This red circle agreement shall remain in effect as long as Logistics Insights Corporation or any CenTra affiliate manages the logistics for Chrysler Corporation in the Detroit Metropolitan area, which involves the local consolidation and pick up and delivery operations. In the event that neither LINC not any CenTra affiliate manages this business, this agreement shall terminate." *Id.*

### 3. Memorandum of Understanding

Finally, the parties have entered into a Memorandum of Understanding which places restrictions on U.S. Truck Holding's ability to cease operations at the Romulus facility, in that the decision to close is subject to a determination by a Change of Operations Committee that the closure is being made for a bona fide economic reason. Pl's Motion Exb. 4. In this connection the memorandum provides that U.S. Truck Holdings will not close a Teamster-represented facility "until the Committee

rules in its favor, deadlocks, or twenty-one (21) days have expired since the filing of its Change of Operations with TNFIC, whichever occurs first." *Id.* The agreement further provides that in the event of deadlock, the matter will be referred to the National Grievance Committee and, if necessary, will be subjected to NMFA grievance procedures for resolution.

## C. The Chronology of Events

On November 11, 1999, the President of U.S. Cartage, Kirk Cummings, notified Plaintiffs of the company's intent to cease operations at the Romulus facility. *See* Pl's Hearing Exb. 1. At the hearing on the motion for preliminary injunction, Local 299 President Don Smith testified that this notice sparked a series of meetings and correspondence between himself and Cummings concerning plant closure. Mr. Smith testified that the company initially indicated its intent to bargain over the issue of closure. However, after some negotiations, the company changed its position and stated that it no longer intended to bargain over the closure itself, merely about its terms.

Specifically, on November 15, 1999, Smith sent Cummings a letter reminding U.S. Cartage of the existence of the Memorandum of Understanding and asking that its terms be complied with, including that a hearing before the Change of Operations Committee be held and that a determination be made concerning whether the closure was due to a bona fide economic reason. Pl's Hearing Exb. 2. Cummings responded on November 16, 1999, indicating that he was aware of the procedures set forth in the Memorandum of Understanding and that a hearing before the Change of Operations Committee would be scheduled for December. Pl's Hearing Exb. 3a.

Smith testified that the parties held their first meeting at some point before November 15, 1999. The parties met again on November 17, 1999. At that meeting, Cummings informed Smith that the terminal was closing due to U.S. Cartage's belief that it would no longer be allowed to participate in Central States Pension Fund ("Central States"), the fund which provides benefits to the Plaintiffs in this case. Cummings testified at the hearing that he received a letter from Central States on October 1, 1999 requesting certain information from U.S. Cartage concerning its continued eligibility. Cummings testified that before becoming the President of U.S. Truck Holdings in 1998, he worked for its predecessor, U.S. Truck, for approximately eight years. Based on experience gained in that position, he concluded that U.S. Cartage's continued participation in the Central States Pension Fund was in jeopardy due to adverse selection.[1] Cummings stated that he might change his position with respect to plant closure if the Union could immediately secure a letter from Central States indicating that it would continue to allow U.S. Cartage to participate in its pension fund, or somehow indicating that it would not be terminated as a contributor.

Smith testified that he contacted Central States in an effort to secure such a letter. He was told that only Trustees of the fund could provide him with such assurances and that the Trustees would be meeting again during the third week of December. Smith claims Cummings knew that he attempted to get a letter from Central States. Cummings, during his testimony, denied any such knowledge, and stated that he had a conversation with Fund representative Pete Priede on December 13, 1999, who indicated that no one from the

---

1. Cummings feared that Central States would disallow his company's participation in the pension fund due to adverse selection. Adverse selection is an actuarial assumption that is made based on the expectation that there will be a steady source of new workers contributing to the pension. If there are no new employees, this assumption is thwarted. The implications of such action by Central States would be to trigger a withdrawal liability on the part of the employer. The amount of their liability would be increased significantly if the process of withdrawal extended into a second calendar year.

union had contacted him concerning such a letter.

Following the parties' November 17, 1999 meeting, Smith sent Cummings a letter summarizing the events of the meeting and stating that the Union needed more time to consider the proposal of terminal closure. Pl's Hearing Exb. 3. In order to allow continued bargaining, the Union also requested information concerning U.S. Cartage's financial condition, *Id.,* which it claims it only received in part.

The parties met again on November 24, 1999. At this meeting, Cummings indicated that the company no longer intended to bargain over the issue of the closing of the Romulus terminal. He indicated that the decision to close was final and proposed "a settlement offer of $5,000.00 per man as severance pay in addition to all vacations, sick days, and any other monies they may have coming under the terms of the contract." Pl's Hearing Exb. 4. In a letter following the November 24, 1999 meeting, Cummings indicated that since the decision to close was final, he considered the Union's request for additional information to be moot. *Id.*

On December 2, 1999, Smith sent Cummings another letter wherein he expressed the Union's position that U.S. Cartage was under an obligation to engage in good faith bargaining over the decision to close the Romulus facility. Pl's Hearing Exb. 5. He also indicated that the additional information the Union requested was not moot, but rather was related to the Union's preparation for the upcoming meeting before the Change of Operations Committee.

On December 3, 1999, Cummings responded. Pl's Hearing Exb. 6. He expressed his concern, not only that U.S. Cartage would lose its status as a contributor to the Central States Pension Fund, but also that in the event that this occurred, there would be a significant loss of U.S. Cartage employees. *Id.* Further correspondence between the parties failed to resolve the issue. *See* Pl's Hearing Exbs. 7, 8, 9, 10.

The parties attempted to negotiate a severance package, but the parties were unable to reach an agreement. Pl's Hearing Exb. 10. The Change of Operations committee met on December 14, 1999 and deadlocked over the issue of whether the decision to close the freight facility was due to a bona fide economic reason. On December 15, 1999, the Plaintiffs filed this lawsuit.

## D. The Three Grievances

Meanwhile, on or about November 23, 1999, Plaintiffs filed three grievances related to the trucking terminal closure. The first alleges that the proposed closure violates the Red Circle Agreement because LINC still manages logistics for Chrysler in Detroit. The union contends that the agreement guarantees them employment under these circumstances. The grievance has not been resolved, nor has it been tabled for resolution.

In their second grievance, Plaintiffs claim a violation of the Memorandum of Understanding which restricts U.S. Truck Holdings' and U.S. Cartage's ability to cease operations at the Romulus terminal. Under the agreement, U.S. Truck Holdings must prove to a Change of Operations Committee that the closing of the plant is due to a bona fide economic reason. This committee is empowered to order U.S. Truck to keep its operations open at the Romulus plant if it concludes that there is no legitimate economic reason to do so.

The final grievance arises under Article 32 of the NMFA, which prohibits U.S. Cartage from diverting bargaining unit work to other entities "owned and/or controlled by the signatory employer, or its parent, subsidiaries or affiliates." (Pl's Exb. 1 at 109). As mentioned above, Plaintiffs believe that U.S. Truck Holdings and its affiliates are acting as alter egos and diverting work performed by Plaintiffs to a nonunion entity called C.C. Midwest Co., a CenTra subsidiary. Thus there are three pending grievances seeking to keep

the Romulus terminal open that are subject to binding arbitration.

### E. Testimony Regarding Irreparable Harm

As evidence of what harm would befall them should the Romulus terminal close, Plaintiffs offered the testimony of four witnesses. First, Local 299 President Smith testified with respect to the status of the local job market for freight. In addition, the Court heard testimony from three U.S. Cartage employees, Mike Kopko, Mark Brown, and Bob Lemle. Each testified with respect to other trucking jobs in the local market, as well as what hardships would be suffered in the event that the facility is closed and an arbitrator does not issue a decision for up to one year. Defendants offered the testimony of U.S. Cartage President Cummings on the issues of other jobs in the local market, as well as evidence of harm that would be suffered by U.S. Cartage in the event that the Court issues an order requiring it to continue operations at the Romulus terminal.

### 1. Status of the Local Job Market for Freight

Most, if not all, of the evidence presented with respect to the issue of the status of the local job market for freight indicated that there are freight jobs available in this market, but that the jobs would not compensate the workers as well as they are currently being compensated as U.S. Cartage employees. Union President Smith testified that there were no new jobs available in the Detroit market during the holiday season, but that things would pick up again in late January or early February. Smith testified that four months ago when Preston Trucking went bankrupt, he attempted to help 140 displaced workers relocate. He stated that fifty-three of them have been placed with other carriers, while eighty workers are still looking.

He indicated that it would be more difficult for the Romulus workers to find jobs elsewhere. However, his testimony indicated that the difficulty did not necessarily lie in not being able to find work at all, but in not being able to find work that would compensate the Romulus workers at the same level as they are being compensated by U.S. Cartage. Under the NMFA, U.S. Cartage employees receive $19.01 per hour plus benefits, including vacation time and health care benefits for a gross annual income of between $50,000 and $60,000 per year. Smith indicated that a displaced worker may be hired by a non-NMFA signatory as a "casual," or temporary employee, but for only $15.00 per hour with fewer or no benefits. (Gross annual being $30,000–$40,000/year). Eventually, a casual may become full-time, but then the wage rate would be $14.00 per hour plus a benefits package. In sum, Smith testified that there are local jobs available in the freight market, but for less money and less benefits.

Likewise, U.S. Cartage President Cummings testified that he contacted the MESC and obtained a printout of many jobs available in the local freight market, albeit for less wages than are available under the NMFA. *See* Def.'s Hearing Exb. 6.

### 2. Employee Hardship

The Plaintiffs also offered the testimony of three U.S. Cartage employees Mike Kopko, Mark Brown and Bob Lemle. Each indicated that they have families to support and that if the facility closes it will result in financial hardship to them and to their families. Mike Kopko testified that he has worked for the company for twenty-one years. He indicated that he is two years from retirement and that if the terminal closes, he will be without health insurance during his retirement. On cross-examination it was revealed that it is a possibility that Mr. Kopko could purchase the remaining two years of his contract and that he would be entitled to a full pension even in the event of terminal closure. He also indicated that his wife, who works part-time, may be forced to work full-time in order to supplement their income should he have to seek employment as a casual.

Plaintiffs also offered the testimony of Mark Brown who has worked as a truck driver for over twenty-two years. He is married with four children. He indicated that if he were forced to find work as a casual his gross income would be approximately $30,000–$40,000, instead of the $52,000–$54,000 he earned last year. He testified that if the plant closes and in one year an arbitrator awards him back pay that would be insufficient to compensate him for his loss. He stated that a decrease in his earnings would take an emotional toll on his family and that he would no longer be able to help his children through college.

Finally, Plaintiffs offered the testimony of Bob Lemle, who has worked for the company for a total of seventeen years. He indicated that if he were forced to seek employment as a casual that his earnings would decrease from last year's total of $58,000 to approximately $25,000–$30,000 annually. He also testified that he often works 15–20 hours per week overtime and that if the terminal closes he would lose the overtime, as well as the pay associated with it. He also testified that he would lose his health insurance and that any back pay an arbitrator may award him later would not be sufficient to compensate him. Mr. Lemle is married with three children ages 16, 13 and 5. He testified that the closing of the plant would create a hardship for his family. Specifically, he mentioned that his wife who works part time would be forced to work more hours and that she would have less time to spend with their five-year-old who is in kindergarten.

### 3. Employer Hardship

President Cummings testified with respect to the actions U.S. Cartage took in an effort to close down operations at the Romulus trucking facility once it made the determination that Central States was threatening to oust it from participation in the pension fund. Cummings testified that since November 12, 1999, the Romulus terminal has operated as though it were closing on December 17, 1999. On December 8, 1999, several drivers were laid off.

During December, CTII, a subsidiary of CenTra and brokerage entity who previously gave U.S. Cartage 98% of its work, began assigning its work to other carriers in preparation for U.S. Cartage's impending closure. CTII has made arrangements for approximately three other terminals, operated by C.C. Midwest, to handle new freight jobs. Exhibits offered by Defendants indicate that the number of loads ready for delivery and for pick-up dramatically decreased on or about December 13, 1999. *See* Def.'s Hearing Exbs. 3 and 4, respectively. The Defendants also offered testimony that the fixed cost of keeping the Romulus terminal open would be approximately $204,844.00 per month. Def.'s Exb. 5.

Cummings stated that on December 13, 1999, U.S. Cartage entered into a release settlement agreement with its mechanics. Def.'s Hearing Exb. 2. The parties agreed to a severance settlement which has already been signed and executed. Approximately thirty-one former U.S. Cartage mechanics have been paid $11,000 each.

Finally, Cummings testified that if the Romulus facility continued to operate into the year 2000, and if it was then dropped by Central States, it would incur significant additional withdrawal liability, a partial withdrawal liability for 1999 and a full withdrawal liability for 2000. A closure in 1999 would avoid double exposure in that the facility would only be liable for the 1999 withdrawal.

### II. Standard for Preliminary Injunction

One of the fundamental principles of labor law is that labor disputes be settled peacefully through voluntary arbitration. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The Norris–LaGuardia Act, 29 U.S.C. § 104, *et seq.* (1973), promotes this policy by limiting a federal court's ability to interfere with labor disputes. Section 4 of the Act states

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following act: (a) Ceasing or refusing to perform any work or to remain in any relation of employment.

29 U.S.C. § 104.

The United States Supreme Court recognized an exception to the proscriptions against the issuance of injunctions in labor disputes set forth in the Act in *The Boys Markets v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The *Boys Markets* Court allowed an injunction against a union strike that centered around an issue that was subject to a contractual grievance procedure. The Court held that "when the underlying dispute is one over which the parties have agreed to arbitrate and the traditional equitable bases for relief have been met, a court may enjoin a strike in violation of a no-strike clause." *Aluminum Workers v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441 (6th Cir.1982).

■ This case is commonly known as a "reverse *Boys' Markets*" situation. It presents the opposite scenario where an injunction is sought, not to stop the union from striking, but to stop the employer from taking action over which an arbitrable grievance has been filed. Courts will enjoin an employer from taking such action pending arbitration if the arbitrator would otherwise be powerless to grant an effective remedy. *Aluminum Workers*, 696 F.2d at 441–42. In other words, the courts apply the *Boys Markets* exception to employer actions "which ha[ve] the effect of evading a duty to arbitrate or which would otherwise undermine the integrity of the arbitral process." *Id.* at 441.

The Sixth Circuit set forth the standard for the issuance of an injunction in this context in *Aluminum Workers*. The court stated:

> The controlling principle is that where, as here, a collective bargaining agreement provides for mandatory grievance arbitration procedures, the federal court should not intrude at the behest of either management or labor into disputes over arbitrable issues *unless intrusion by injunction is necessary to protect the arbitral process itself.*

*Id.* at 442.

■ The court went on to specifically describe what the union must prove. First, the court must make a finding that the underlying grievance is arbitrable. *Boys Markets*, 398 U.S. at 254, 90 S.Ct. 1583. In addition, the union must show that injunctive relief is appropriate under "ordinary principles of equity."[2] In this connection, the court clearly stated:

> *Rock and Roll Hall of Fame v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir.1998); *See also Parker v. United States Dept. of Agriculture*, 879 F.2d 1362, 1367 (6th Cir.1989).
> The foregoing considerations are "factors to be balanced, not prerequisites that must be met." *Mascio v. Public Employees Retirement System of Ohio*, 160 F.3d 310 (6th Cir.1998), quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985). Where the three factors other than the likelihood of success on the merits all strongly favor issuing the TRO, a district court is within its discretion in issuing the order if the merits present a sufficiently serious question to justify further investigation. *In re DeLorean*, 755 F.2d at 1230. Alternatively, the court may also issue injunctive relief if the movant, "at least shows

---

**2.** The availability of injunctive relief is a procedural question that is governed by federal law. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir.1991). The Sixth Circuit has held that a court must consider four factors in deciding whether to issue a TRO or preliminary injunction:

(1) whether the movant has shown a strong or substantial likelihood of success on the merits;

(2) whether the movant has demonstrated irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest is served by the issuance of an injunction.

Specifically, the union must demonstrate the breaches of the agreement are occurring and will continue, or have been threatened and will be committed; that the union has suffered or will suffer irreparable harm as a result; and that the union will suffer more from the denial of the injunction than the company will from its issuance.

*Id.*

█ In sum, the union must demonstrate arbitrability and three elements entitling them to equitable relief: (1) ongoing breaches; (2) irreparable harm; and (3) that the balance of hardships warrants injunctive relief.

## III. Analysis

### A. Arbitrability

The Court must find that the underlying issues are arbitrable. *Boys Markets,* 398 U.S. at 254, 90 S.Ct. 1583; *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO,* 428 U.S. 397, 407, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In *Aluminum Workers,* the Sixth Circuit noted one of the requirements of traditional equitable relief is that the moving party must demonstrate a likelihood of success on the merits. However, that requirement is not applied literally in labor law because of the principle that courts not encroach upon the arbitrator's authority by predicting the outcome on the merits. Thus the Sixth Circuit requires only that a party seeking to maintain the status quo pending arbitration "establish that the position he will espouse in arbitration is sufficiently sound

> serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985).

3. In ruling on the motion for temporary restraining order, the Court found that there were genuine disputes over provisions of the collective bargaining agreement. First the Court found an issue with respect to the Red Circle Agreement concerning whether LINC (CenTra) is managing logistics in the Detroit area within the meaning of the agreement.

to prevent the arbitration from being a futile endeavor." *Aluminum Workers,* 696 F.2d at 442 at n. 2. At the beginning of the Plaintiff's presentation of proofs on the motion for preliminary injunction, the parties stipulated that the underlying issues are arbitrable.[3]

### B. Equitable Bases for Relief

#### 1. Ongoing Breaches

The Court must find that there are ongoing breaches of the agreement and that these breaches will continue. While it is not the district court's province to determine the ultimate merits of the underlying issues, there appear to be bona fide and continuing disputes concerning the parties' respective rights and responsibilities with respect to the collective bargaining agreement. *See supra* n. 3.

#### 2. Irreparable Harm

##### a. *Aluminum Workers, Lever Bros.* and *Akers*

The crux of the dispute here centers around whether the Plaintiffs have demonstrated irreparable harm. The Sixth Circuit defines irreparable harm in this context as "injury so great that an arbitrator's award, if forthcoming, would be inadequate to fully recompense the injured party. It renders the award an 'empty victory'." *Aluminum Workers,* 696 F.2d at 443, quoting *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad,* 363 U.S. 528, 534, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960). The court continued:

> Second, under the Memorandum of Understanding, there must be a bona fide economic reason for the facility closure. There is a genuine dispute about whether closure can proceed now that the Change of Operations Committee deadlocked, or whether other steps set forth in the agreement must be complied with first. Finally, with respect to the grievance filed under Article 32 of the NMFA which prohibits the diversion of bargaining unit work, there is a dispute about the ownership and control of the companies and whether or not the Defendants are diverting work in violation of that agreement.

Because it is the very "frustration or vitiation of arbitration" which justified the narrow exception to the anti-injunction provision of the Norris–LaGuardia Act, the irreparability of the injury suffered by the union has in many cases become virtually the sole inquiry in those cases where injunctive relief is sought against the employer.

*Aluminum Workers,* 696 F.2d at 443, citing *Local Lodge No. 1266 v. Panoramic Corp.,* 668 F.2d 276 (7th Cir.1981).

In *Aluminum Workers,* the underlying arbitrable issue concerned the employer's reorganization of job classifications. The alleged irreparable harm was the loss of employment for sixteen workers. *Aluminum Workers,* 696 F.2d at 443. The court of appeals held that this was not enough to demonstrate irreparable harm:

Absent some indication of action on the part of the employer which could jeopardize its ability to reinstate affected employees or to pay them wages for the period of unemployment, we hold that loss of employment, even if occasioned by employer action which is subject to arbitration, is not irreparable harm and will not support a claim by the union for injunctive relief.

*Id.*

The *Aluminum Workers* Court distinguished two other cases in which courts found that the union demonstrated irreparable harm. In *Lever Brothers Co. v. International Chemical Workers Union,* 554 F.2d 115 (4th Cir.1976)("*Lever Bros.*"), the underlying arbitrable issue concerned the employer's decision to relocate a plant. The Fourth Circuit held that the district court did not abuse its discretion by issuing a preliminary injunction pending arbitration. The court of appeals did not specifically address the issue of irreparable harm, however, the court noted, in an addendum to its opinion, that absent a preliminary injunction, the employees "would have been totally and permanently deprived of their employment." *Id.* at 122.

In *Drivers, Chauffeurs, Warehousemen & Helpers, et al. v. Akers Motor Lines,* 582 F.2d 1336 (4th Cir.1978)("*Akers*"), the court held that the union demonstrated irreparable harm where the employer sought to partially liquidate its business. The court stated:

If Akers–Central is allowed to continue its process of liquidation and disposition of assets, any victory by the union at the arbitration table may be meaningless. If the remaining terminals and vehicles are sold, there will be no jobs for reassignment to Local 71 employees. If assets from ongoing operations are encumbered, there will be no fund from which to pay vacation monies. [T]he arbitral award when rendered could not return the parties substantially to the status quo.

*Akers,* 582 F.2d at 1341.

In so holding, the court of appeals affirmed the district court's grant of injunctive relief. It is important to note that the district court did not require that the defendants in Akers maintain their trucking facility; rather the court enjoined the employer from "further encumbering capital assets pending resolution of ongoing arbitration of grievances filed by the union." *Id.* at 1338; 1343.

In determining that irreparable harm was not demonstrated in *Aluminum Workers,* the Sixth Circuit distinguished *Lever Bros.* and *Akers* without questioning their authority. The *Aluminum Workers* Court stated: "We do not take issue with the decisions of the Fourth Circuit in *Lever Brothers* and *Akers.* However, the 'compelling circumstances' of those two cases are not before us. *Unlike the situation in those cases, there is no evidence in this record to suggest that Consolidated would be unable to comply fully with an order for backpay and reinstatement in the event the arbitrator found the company in violation of the agreement.*" *Aluminum Workers,* 696 F.2d at 444 (emphasis added).

On the issue of economic hardship, the court in *Aluminum Workers* found that potential economic problems such as fore-

closure, repossessions and injury to credit status did not "represent the type of harm that, by its occurrence, threatens the integrity of the arbitral process." *Id.* The Court concluded: "There being no evidence in the record to suggest Consolidated's *inability to render backpay or to reinstate* the sixteen employees in the event of an arbitrator's decision for the Union, we hold that the Union has failed to establish that it will suffer irreparable harm ..." *Aluminum Workers,* 696 F.2d at 444 (emphasis added).

Thus the Sixth Circuit has clearly held that economic loss alone is not enough to establish irreparable harm where an employer is solvent and reinstatement is possible. *Aluminum Workers.* However, the Sixth Circuit did not take issue with the Fourth Circuit's decisions in *Lever Bros.* or *Akers.* The court seemed to suggest that the compelling circumstances involved in those cases warranted equitable relief.

### b. Application of the Cases to these Facts

#### i. Ability to award back pay

■ The *Aluminum Workers* Court was concerned with both the employer's ability to provide back pay, and its ability to reinstate. This case presents a situation wherein the company will have the ability to pay, but not to reinstate the employees to their jobs at the Romulus terminal. The uncontroverted testimony was that U.S. Cartage is a non-asset based company whose value of approximately $5 million is held by U.S. Truck Holdings. Thus in the event of an arbitrator's decision to order back pay, there is evidence on this record that the Defendants would be able to comply with that order. In order to protect the meaningfulness and integrity of the arbitral process here, these assets must be maintained at the status quo. As in *Akers,* any award of back pay would be rendered meaningless if the Defendant-company has liquidated its assets. Therefore, the injuries complained of will not be adequately addressed by the arbitrator's award if there are no longer any assets to fulfill a potential award. Although there is testimony in the record that there has been no decision made with respect to what might happen with the assets of U.S. Truck Co. Holdings, it is not beyond reason to think that the owners may decide to liquidate those assets some time before the arbitration process is completed, and the Court enjoins them from doing so.

This Court is mindful of the pronouncement, in *Aluminum Workers,* that potential economic harm suffered by employees does not constitute irreparable harm. *See id.,* 696 F.2d at 443. The court of appeals found that the potential for economic problems such as foreclosure, repossessions, and injury to credit status did not represent the type of harm that, by its occurrence, threatens the integrity of the arbitral process. *Id.* The court concluded, there being no evidence in the record to suggest the company's inability to render backpay or to reinstate the sixteen employees in the event of an arbitrator's decision for the union, that the union failed to establish irreparable harm.

■ Similarly here, the Court finds that the Union has failed to establish that its harm would be irreparable in that its employees would be required to take lower paying jobs, suffer financial hardships, or be forced to have other family members seek additional employment to cover lost wages, etc. However, the irreparable harm here lies in the fact that the arbitration process itself would be compromised if the company completely liquidated its business because any award of back pay or other damages would be rendered meaningless. The business at issue in *Aluminum Workers* was an on-going enterprise and the court found that there was no evidence that the company "would be unable to comply fully with an order for backpay and reinstatement ...". *Id.* at 444. In contrast, this business, more akin to *Akers,* is closing down and the harm lies in the fact that the company here would not be able to fully comply with an order

for backpay if it continues to liquidate its assets.

## ii. Ability to reinstate

The company's ability to reinstate the workers if ordered to do so, is another issue that concerned the court in *Aluminum Workers*. *Id.* at 444, 445. The meaningfulness of the arbitration process is compromised when the arbitrator awards a party relief which cannot be afforded. If reinstatement is ordered but there are no jobs to go back to, the remedy awarded is meaningless.

■ The Court finds that although technically the workers here would have not have their jobs to return to if an arbitrator ordered such relief, the company's inability to reinstate does not constitute irreparable harm under the circumstances of this case. Unquestionably, there is a deprivation of employment because this particular employer would not have the ability to reinstate these employees to their specific jobs. However, there was testimony presented to the Court that the local freight industry is reasonably fluid. There was evidence that companies in this industry tend to come and go throughout the area. For example, the alleged affiliated company, C.C. Midwest, opened four terminals in the last several months in the greater Detroit area. There is nothing in this record to suggest that if, as a result of the arbitration, the Defendants are ordered to reopen, that they would be unable to rebuild their business in the local freight industry. The Court does not intend to suggest that there would be some guarantee that all of U.S. Cartage's customer base would return; however, given that there are two companies that broker the business for local freight in the Detroit area, it is not unreasonable to assume that U.S. Cartage could regain its customers over a reasonable period of time. These facts distinguish this situation from that in *Lever Brothers* in that the employees have not established that they would be "totally and permanently deprived of their employment." *Lever Bros. v. International Chemical Workers Union,* 554 F.2d 115, 122 (4th Cir.1976).

In sum, the Plaintiffs have not demonstrated irreparable harm except to the extent that the arbitration process may be compromised if the Defendant is permitted to dissipate and liquidate its remaining assets. The *Aluminum Workers* Court emphasized repeatedly that irreparable harm must go to the protection of the arbitral process itself, and the Court finds that the only instance of irreparable harm that the Plaintiffs have established here is that the arbitral process would be compromised if the Defendants were allowed to liquidate their remaining assets.

The Court also finds that the arbitration should proceed on an expedited basis within the framework set forth in the parties collective bargaining agreement. The Court is not attempting to rewrite the parties' existing contract, but rather to ensure that the arbitration process is efficiently utilized in order to resolve the pending grievances as expeditiously as possible. *See, e.g., Akers,* 582 F.2d at 1343.

### 3. Balance of the Hardships

■ The Court must also find that the balance of the hardships warrants the grant of injunctive relief. *Aluminum Workers,* 696 F.2d 437, 444–45. The Court is satisfied that on these facts, the injunctive relief set forth above strikes an equitable balance between the parties' respective positions. As discussed above, it is unnecessary for the protection of the arbitration process for this Court to order that the Defendants maintain operations at their trucking facility. Moreover, the balance of the hardships rests in favor of the employer on this point.

President Cummings testified with respect to the actions U.S. Cartage took in an effort to close down operations at the Romulus trucking facility. Cummings testified that since November 12, 1999, the Romulus terminal has operated as though it were closing on December 17, 1999. On

December 8, 1999, several drivers were laid off. Also during December, the brokerage entity who previously gave U.S. Cartage 98% of its work, began assigning its work to other carriers in preparation for U.S. Cartage's impending closure. The entity has also made arrangements for approximately three other terminals to handle new freight jobs. U.S. Cartage entered into a release settlement agreement with its mechanics on December 13, 1998, resulting in approximately thirty-one former U.S. Cartage mechanics having been paid $11,000 each. Def.'s Hearing Exb. 2. Finally, Cummings testified that if the Romulus facility continued to operate into the year 2000, and if it was then dropped by Central States, it would incur significant additional withdrawal liability, a partial withdrawal liability for 1999 and a full withdrawal liability for 2000. A closure in 1999 avoids this double exposure.

Keeping in mind all of the steps the Defendants have already taken to close the facility, considered in light of the evidence that in this industry a freight facility can be reestablished within a relatively short period of time, the balance of the hardships on this issue rests on the side of the employer. It would be unreasonable under the circumstances to require them to maintain operations. *See Akers,* 582 F.2d at 1343 ("the occurrences between September 1977 and March 10, 1998, make restoration of the [s]tatus quo ante a virtual impossibility." *Id.*)

In contrast, with respect to maintaining the current assets of the company, the balance of the hardships rests in the employees' favor, with little burden to the employer. There was testimony presented on the record that U.S. Truck Co. Holdings has approximately $5 million in assets. Requiring them to maintain these assets not only protects the integrity of the arbitration process, but protects the interests of the employees who may be left without a meaningful remedy in the event of an arbitrator's award in their favor.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, for the reasons set forth above, and for the reasons stated on the record on December 21, 1999, the Court hereby orders as follows:

The Plaintiff's motion for preliminary injunction is GRANTED IN PART AND DENIED IN PART NUNC PRO TUNC.

IT IS ORDERED THAT the Defendants be enjoined from further liquidating the assets of U.S. Truck Co. Holdings, and to the extent there are any assets, U.S. Cartage of Romulus.

IT IS FURTHER ORDERED THAT the arbitration process in this case be expedited within the framework of the parties' collective bargaining agreement.

SO ORDERED.